**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE CORPORATION,<br><br>New York, New York<br><br>     Plaintiff,<br><br>  v.<br><br>PUBLIC COMPANY ACCOUNTING<br>OVERSIGHT BOARD,<br>1666 K Street NW<br>Suite 300<br>Washington, D.C. 20006-2803,<br><br>     Defendant. | Civil Action No.<br><br>**COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff John Doe Corporation[1] brings this action for declaratory and injunctive relief against the Public Company Accounting Oversight Board and states the following in support thereof.

### PRELIMINARY STATEMENT

1. Plaintiff is a New York-based accounting firm registered with the Public Company Accounting Oversight Board ("PCAOB" or "Board"), and facing an ongoing disciplinary proceeding by the Board, which the Board has recently stayed.

2. Plaintiff brings this action to prevent the irreparable injury it will suffer if forced to continue to participate in the Board's disciplinary proceeding, which is unconstitutional for numerous reasons.

---

[1] John Doe is a pseudonym used to protect Plaintiff's true identity. Contemporaneous to this Complaint, Plaintiff is filing a motion to proceed pseudonymously.

3.    *First*, the Chief Hearing Officer who oversees the proceeding is an "Officer of the United States" subject to the Appointments Clause, and therefore must be appointed by the President, a court, or a "Head[] of Department[]," as determined by Congress.  U.S. Const. art. II, § 2, cl. 2.  But the Chief Hearing Officer was not so appointed.  Rather, following *Lucia v. SEC*, 585 U.S. 237 (2018), the Securities and Exchange Commission ("SEC" or "Commission") purported to ratify the Board's pre-existing appointment of the Chief Hearing Officer.  The Board, however, is not a "Head[] of Department[]" in whom appointment authority can be vested, and the Commission was *not* empowered by Congress to appoint the Chief Hearing Officer.  Compounding the problem, the Chief Hearing Officer is impermissibly afforded multiple levels of removal protection, ensuring that he is "not accountable to the President, and [the] President . . . is not responsible for the [Chief Hearing Officer]."  *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 495 (2010).

4.    *Second*, the disciplinary proceeding violates the Seventh Amendment of the U.S. Constitution.  In *SEC v. Jarkesy*, 603 U.S. 109 (2024), the Supreme Court held that actions pursuing common-law claims and seeking legal remedies must be brought in court where the defendant is entitled to a jury and cannot be adjudicated through administrative proceedings such as the disciplinary action at issue here.  *Id.* at 119–20.  Because the Board's allegations against Plaintiff are akin to professional malpractice—a common law claim—and it endeavors to impose monetary penalties—a legal remedy—Plaintiff's Seventh Amendment right to a jury trial attaches and the Board's claims cannot be adjudicated through an in-house agency proceeding.

5.    *Third*, the disciplinary proceeding violates Plaintiff's due process rights.  The Board combines the functions of "investigator, prosecutor, and judge under one roof" and "employ[s] relaxed rules of procedure and evidence—rules [it] [has made] for [itself]."  *Axon Enter., Inc. v.*

*FTC*, 598 U.S. 175, 215 (2023) (Gorsuch, J., concurring).  The result is an extraordinarily "tilted . . . game," *id.*, in which "the risk of unfairness is intolerably high."  *Withrow v. Larkin*, 421 U.S. 35, 53–58 (1975).

6.    *Fourth*, the disciplinary proceeding is an impermissible delegation of governmental power to private actors absent sufficient supervision.  "For a delegation of governmental authority to a private entity to be constitutional, the private entity must act only 'as an aid' to an accountable government agency that retains the ultimate authority to 'approve[ ], disapprove[ ], or modif[y]' the private entity's actions and decisions on delegated matters."  *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1325 (D.C. Cir. 2024) (alterations in original) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940)).  But a vast portion of the activities of the Board's Division of Enforcement and Investigations ("Enforcement Staff") are conducted absent oversight by the SEC or even the Board.  After typically years-long investigations, targets of Board disciplinary actions often settle rather than defend themselves before the Board.  In that common scenario, the SEC plays no oversight role at all in the Board's enforcement, and the Board's oversight of the Enforcement Staff is minimal at best.

7.    *Fifth*, the disciplinary proceeding reflects Congress's impermissible delegation to the Board to establish "fair procedures for the investigation and disciplining of registered public accounting firms and associated persons of such firms."  15 U.S.C. § 7215(a).  In order for a delegation to be constitutional, Congress must "lay down by legislative act an intelligible principle to which the person or body authorized [to exercise the delegated authority] is directed to conform . . . ."  *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).  By stating only that the Board is expected establish procedures that are "fair," Congress provided no intelligible principle for the Board to follow.

8.    This Court should accordingly issue a declaratory judgment holding the Board's disciplinary hearing unconstitutional and an injunction preventing the Board from proceeding with that action, along with any other necessary relief.

## THE PARTIES

9.    Plaintiff John Doe Corporation is a New York-based accounting firm registered with the PCAOB.

10.    Defendant is a private, non-profit corporation created by the Sarbanes-Oxley Act (the "Act"), 15 U.S.C. § 7211, and organized under the laws of the District of Columbia.  The PCAOB is headquartered at 1666 K Street NW #300, Washington, D.C. 20006.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction pursuant to Article III, § 2 of the United States Constitution and 28 U.S.C. §§ 1331, 1367, and 1651.  *See also Free Enter. Fund*, 561 U.S. at 490; *Axon*, 598 U.S. at 183–89; *Free Enter. Fund v. PCAOB*, 537 F.3d 667, 670–71 (D.C. Cir. 2008), *abrogated on other grounds by Free Enter. Fund*, 561 U.S. at 477.

12.    This Court is authorized to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

13.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendant's office is in this district and because a substantial part of the events giving rise to the claims occurred in this district.

## BACKGROUND

### A.    Statutory and Regulatory Background

14.    The PCAOB was created by the Sarbanes-Oxley Act of 2002, 116 Stat. 745, *codified at* 15 U.S.C. § 7211, *et seq.*  The Act in general, and the creation of the Board in particular,

was a reaction to several high-profile accounting scandals during the early 2000s. *Free Enter. Fund*, 561 U.S. 477.

15.     Modeled after private self-regulatory securities industry organizations responsible for investigating and disciplining their own members (subject to oversight by the SEC), the Board was created as a private, nonprofit, non-governmental corporation under the laws of the District of Columbia. *Id.* In fact, Congress specifically provided in the Act that "[t]he Board shall not be an agency or establishment of the United States Government" and "[n]o member or person employed by, or agent for, the Board shall be deemed to be an officer or employee of or agent for the Federal Government by reason of such service." 15 U.S.C. § 7211(b).

16.     "Unlike . . . self-regulatory organizations, however, the Board is a Government-created, Government-appointed entity, with expansive powers to govern an entire industry." *Free Enter. Fund*, 561 U.S. at 485.

17.     The Board's mandate is sweeping: as to the auditors of publicly traded companies, brokers or dealers, it is charged with enforcing the Sarbanes-Oxley Act, as well as the federal securities laws, the rules of the SEC, the Board's own rules, and professional auditing standards. "To this end, the Board may regulate every detail of an accounting firm's practice, including hiring and professional development, promotion, supervision of audit work, the acceptance of new business and the continuation of old, internal inspection procedures, professional ethics rules, and 'such other requirements as the Board may prescribe.'" *Id.* (quoting 15 U.S.C. § 7213(a)(2)(B)).

18.     At its inception, the Board was empowered to adopt "initial or transitional standards" comprised of "any portion of any statement of auditing standards or other professional standards that the [Board] determine[d] satisf[ied] the requirements of [the Sarbanes-Oxley Act]," provided that those standards were "proposed by 1 or more professional groups of accountants."

Order Regarding Section 103(a)(3)(B) of the Sarbanes-Oxley Act of 2002, Exchange Act Release No. 47745 (Apr. 25, 2003);[2] *see also* 15 U.S.C. § 7213(a)(3)(A)–(B).

19.     Exercising that authority, the PCAOB adopted Rule 3200T, which required registered firms and individuals to comply with "generally accepted auditing standards, as described in the [Association of International Certified Public Accountants ("AICPA")] Auditing Standards Board's Statement of Auditing Standards No. 95, as in existence on April 16, 2003"—known as GAAS.  Order Regarding Section 103(a)(3)(B) of the Sarbanes-Oxley Act of 2002.

20.     The Sarbanes-Oxley Act also authorized the Board to initiate its own formal investigations and disciplinary proceedings.  *See* 15 U.S.C. § 7215.

21.     Per its rules and by-laws, the Board has delegated many of its statutorily assigned responsibilities to its staff, including the Enforcement Staff and the Chief Hearing Officer.  *See generally* PCAOB Bylaws and Rules, Section 5: Investigations and Adjudications.

22.     In investigations and disciplinary proceedings, the Enforcement Staff has a broad array of responsibilities, including, but not limited to, conducting so-called "informal inquiries." *See* Rule 5100.  Once a formal investigation has been initiated, the Enforcement Staff is authorized to issue accounting board demands ("ABDs") for testimony and documents, Rule 5102(b); to take sworn testimony, Rule 5102(c)(1); to examine books and records, Rule 5104; and to coordinate with the SEC's Division of Enforcement "to protect any ongoing Commission investigation," Rule 5112(a).

---

[2]  *Available at* https://www.sec.gov/rules-regulations/2003/04/order-regarding-section-103a3b-sarbanes-oxley-act-2002 (last visited Jan. 7, 2025).

23.     Upon a determination that a hearing is warranted to assess whether an individual or entity has violated the statutes and rules within its purview, the Board may order that one be initiated.  *See* Rule 5200(a).

24.     Pursuant to the Sarbanes-Oxley Act and its own rules, the Board delegates responsibility for conducting hearings to the Chief Hearing Officer.  *See* 15 U.S.C. § 7211(g)(2); Rule 5200.[3]

25.     Once assigned, the Chief Hearing Officer's duties include, among other things, "obtaining a court reporter to administer oaths and affirmations"; "issuing accounting board demands"; "receiving relevant evidence and ruling upon the admission of evidence and offers of proof"; "holding prehearing and other conferences and requiring the attendance at any such conference of at least one representative of each party who has authority to negotiate concerning the resolution of issues in controversy"; "scheduling hearing dates"; and, except where the rules otherwise provide, "considering and ruling upon all procedural and other motions."  Rule 5200(c). The rules provide a catch-all provision empowering the Chief Hearing Officer to "regulat[e] the course of a proceeding and the conduct of the parties and their counsel."  *Id.*  Evidentiary rulings are at the discretion of the Chief Hearing Officer, Rule 5441, and violations must be proven by a preponderance of the evidence, Rule 5204(a).

26.     Once a hearing is completed, the rules direct the Chief Hearing Officer to issue an initial decision "includ[ing] findings and conclusions, including sanctions, if appropriate, and the reasons or basis therefor, as to all the material issues of fact, law or discretion presented on the

---

[3] *See also* Order Approving Proposed Rules Relating to Investigations and Adjudications, SEC Rel. No. 34-49704, 2004 WL 1439833 (May 14, 2004).  Although the Rules refer generically to a "hearing officer," Chief Hearing Officer Mark Dorfman is the only such officer currently in role.

record and such other information as the Board may require."  Rule 5204(b).  Decisions become

final upon the Board's affirmance following review or, if no petition for Board review is filed, 20

days after the period for filing a petition for review has lapsed.  Rule 5204(d).

27.    The Board is authorized to impose sanctions that include permanent revocation of

a firm's Board registration and civil monetary penalties exceeding $1 million per violation for

natural persons and $25 million for firms.  *See* 15 U.S.C. § 7215(c)(4); 17 C.F.R. § 201.1001.

Moreover, a willful violation of any Board rule is automatically considered a willful violation of

the Securities Exchange Act of 1934—"a federal crime punishable by up to 20 years' imprisonment

or $25 million in fines ($5 million for a natural person)."  *Free Enter. Fund*, 561 U.S. at 485 (citing

15 U.S.C. §§ 78ff(a), 7202(b)(1)).

28.    Pursuant to the Sarbanes-Oxley Act, the SEC may review any disciplinary sanction

imposed by the Board either on a petition by the respondent or on the SEC's own initiative.  *See*

15 U.S.C. §§ 7217(c)(1)-(3); Rule 5206(b).  If no petition is filed, however, there is no requirement

for the Commission to review a decision by the Board, and the Board's decision, including any

sanctions imposed, becomes final by default.  *See* Rule 5206.  Aggrieved parties may challenge "a

final order of the Commission" in a court of appeals.  15 U.S.C. §§ 78y(a)(1), (b)(1), (c)(1).

29.    In its 22-year history, the PCAOB has encountered multiple issues with the legality

of its structure and operations under Article II of the U.S. Constitution.

30.    In 2010, the Supreme Court found unconstitutional the provision of the Sarbanes-

Oxley Act providing that the SEC could remove PCAOB members "only 'for good cause shown,'

'in accordance with' certain procedures."  *Free Enter. Fund*, 561 U.S. at 486 (quoting 15 U.S.C.

§ 7211(e)(6)).  Because SEC commissioners are also only removable for cause, the Supreme Court

held that the "dual for-cause limitations on the removal of Board members contravene the

Constitution's separation of powers." *Id*. at 492.  To cure the infirmity, the Court excised the "for good cause shown" restriction from the statute, leaving the members of the Board subject to removal by the Commission at will.  *Id*. at 509.

31.     In *Lucia v. SEC*, 585 U.S. 237, the Supreme Court considered application of the Appointments Clause in the related context of the Commission's administrative law judges ("ALJs"), finding that ALJs are "Officers of the United States" within the meaning of Article II.

32.     Recognizing the possibility that "legal uncertainty . . . about the PCAOB hearing officer" could arise in the wake of *Lucia*, the PCAOB changed its rules to account for the Supreme Court's decision.  *See* Bylaw and Rule Amendments to Provide that the PCAOB's Appointment and Removal of Its Hearing Officers Are Subject to Commission Approval, PCAOB Release No. 2019-001 (Jan. 29, 2019) at 3–6 ("*Lucia* Press Release").[4]  Specifically, the Board amended Article VI.3 of its bylaws to provide that "the appointment or removal of any hearing officer shall be made by the Governing Board and shall be subject to the approval of the Securities and Exchange Commission."  Bylaw VI.3.

33.     In the Charter for the Office of Hearing Officers, the PCAOB clarified that "[t]he Board may appoint and remove hearing officers only with the approval of the Commission [and] [t]herefore, any such appointment or removal is subject to a vote of each multimember body."  *See* Charter 2, Off. of Hearing Officers for the PCAOB ("Charter") (Mar. 25, 2021).[5]  "The Board may not seek to remove a hearing officer . . . to influence the outcome of a proceeding" or "for invidious

---

[4]    *Available at* https://pcaobus.org/Rulemaking/Docket045/Release-2019-001-Bylaws-Amendments.pdf (last visited Jan. 7, 2025).

[5]    *Available at* https://assets.pcaobus.org/pcaob-dev/docs/default-source/enforcement/documents/oho-charter-final.pdf?sfvrsn=f23c6871_4 (last visited Jan. 7, 2025).

reasons otherwise prohibited by law[,]" to include "removal on the basis of race, color, religion, sex, or national origin." *Id.* at 3 n.13.

34.    On April 8, 2019, Chief Hearing Officer Mark B. Dorfman was sworn in, his appointment having been approved by the SEC in accordance with the rules and guidelines just described. *See* Marc B. Dorfman Sworn in as the PCAOB's Chief Hearing Officer, PCAOB (Apr. 8, 2019).[6]

**Factual Background**

36.    Plaintiff is a New York-based accounting firm registered with the PCAOB. Plaintiff is well respected in the industry and holds itself to the highest standards in dealings with clients and regulators.

37.    This matter began when Enforcement Staff contacted Plaintiff regarding an audit engagement by Plaintiff for a company whose securities were registered with the Commission and listed on a stock exchange in the United States. As the Enforcement Staff knew at the time, Plaintiff had never issued an audit report for the company and, thus, investors in the company had never relied on any audit work conducted by Plaintiff.

38.    The Enforcement Staff's initial outreach was accompanied by a request for information concerning the audit engagement, which Plaintiff voluntary provided. Despite that cooperation, the Board thereafter issued an order of formal investigation, which authorized the Enforcement Staff to compel the production of documents and testimony. *See* Rules 5102 and 5103. Plaintiff responded to at least 10 document requests submitted by the Enforcement Staff

---

[6] *Available at* https://pcaobus.org/news-events/news-releases/news-release-detail/marc-b-dorfman-sworn-in-as-the-pcaob-s-chief-hearing-officer_699 (last visited Jan. 7, 2025).

and made six employees available for testimony.  In total, the six witnesses testified about the matter for eight days.

39.    After a multi-year long investigation, and despite Plaintiff's extensive cooperation, the Enforcement Staff informed Plaintiff that it would recommend that the Board commence a disciplinary proceeding for violations of Board audit standards in relation to Plaintiff's never-completed audit for the company.

40.    Several weeks later, Enforcement Staff informed Plaintiff that the Board had approved the issuance of an Order Instituting Proceedings alleging violations of certain audit standards.  Specifically, the Order alleges that Plaintiff violated Board Rules 3100 and 3200 and an audit standard derived from GAAS.  It further alleges that Plaintiff's failure to explain its policies and procedures regarding certain audit steps in a manner that provided reasonable assurance that the policies and procedures were understood and would be followed constituted violations of Board Rules 3100 and 3400T and Quality Control Standard 20.  The Order requires the Chief Hearing Officer to determine, among other things, whether violations of the applicable audit standards occurred, and, if they did occur, what sanctions, if any, are appropriate, including the imposition of civil money penalties, revocation of registration, censure, and/or limitation of activities.

41.    To Plaintiff's knowledge, the Order is the first in which the Board has pursued a theory of violation in relation to the audit standards at issue and against a firm that did not complete an audit report.

42.    After being informed of Plaintiff's forthcoming lawsuit, the Board voted to voluntarily stay the disciplinary proceeding against Plaintiff.

**The PCAOB's Disciplinary Proceeding Violates the Constitution**

**A.     The Board's Chief Hearing Officer Is Unconstitutionally Appointed And Subject To Unconstitutional Removal Restrictions**

*1.     The PCAOB's Chief Hearing Officer is an "Officer of the United States"*

45.     The Supreme Court's decision in *Lucia v. SEC* establishes that the Chief Hearing Officer is an inferior officer subject to the Appointments Clause.  As described above, the Court found in *Lucia* that the strictures of the Appointments Clause apply to SEC ALJs.  In so holding, the Court looked back to its decision in *Freytag v. Commissioner*, 501 U.S. 868 (1991), in which the Court found that "special trial judges" of the Tax Court ("STJs") are inferior officers.  *Lucia*, 585 U.S. at 238.  *Freytag*, the Court explained, "sa[id] everything necessary to decide" that SEC ALJs are also inferior officers.  *Id.* at 247 (citing *Freytag*, 501 U.S. at 881).

46.     "To begin," the Court observed, "the Commission's ALJs, like the Tax Court's STJs, hold a continuing office established by law."  *Id.* (citing *Freytag*, 501 U.S. at 881).  Still more, the Commission's ALJs exercise the same "significant discretion" when carrying out the same "important functions" as STJs.  *Id.* at 248 (quoting *Freytag*, 501 U.S. at 878).  "Both sets of officials[,]" the Court noted, "have all the authority needed to ensure fair and orderly adversarial hearings—indeed, nearly all the tools of federal trial judges."  *Id.* (citing *Butz v. Economou*, 438 U.S. 478, 513 (1978)).  The Court then proceeded to examine the responsibilities highlighted in *Freytag*, finding that they applied to SEC ALJs "point for point":

> First, the Commission's ALJs (like the Tax Court's STJs) "take testimony." More precisely, they "[r]eceiv[e] evidence" and "[e]xamine witnesses" at hearings, and may also take pre-hearing depositions.  Second, the ALJs (like STJs) "conduct trials." . . . [T]hey administer oaths, rule on motions, and generally "regulat[e] the course of" a hearing, as well as the conduct of parties and counsel.  Third, the ALJs (like STJs) "rule on the admissibility of evidence."  They thus critically shape the administrative record (as they also do when issuing document subpoenas).  And fourth, the ALJs (like STJs) "have the power to enforce compliance with discovery orders."

*Id.* (alterations in original except fourth & fifth) (citations omitted).

47.    The same is true for the Chief Hearing Officer.  Like STJs and ALJs, the Chief Hearing Officer's position is permanent, not temporary—indeed, Mr. Dorfman has been in his role for 11 years.  *See* PCAOB Names Marc B. Dorfman as Chief Hearing Officer, PCAOB (Oct. 23, 2013).[7]  And per the Board's rules, the Chief Hearing Officer presides over enforcement proceedings, issues ABDs for testimony and documents, receives evidence, rules on admissibility and offers of proof, decides procedural and other motions, and has the authority to compel the presence of party representatives at hearings.  *See* Rule 5200(c).  In short, like STJs and ALJs, the Chief Hearing Officer "critically shape[s] the administrative record" and has broad authority to "regulat[e] the course of a hearing, as well as the conduct of parties and counsel."  *Lucia*, 585 U.S. at 248 (second alteration in original) (internal quotation marks omitted).

48.    The comparison holds with respect to responsibilities *after* a hearing.  In *Lucia*, the Court observed that ALJs maintain more autonomy to issue decisions than STJs because the SEC can opt not to review their decisions, leaving them to "become[] final" and be "deemed the action of the Commission."  *Id.* at 249.  Likewise, per the Board's rules, an initial decision by the Chief Hearing Officer may become final after 20 days if no petition for review is filed.  Rule 5204(d)(2).

49.    The Board all but admitted that *Lucia* establishes that the Chief Hearing Officer is subject to the Appointments Clause when it altered its bylaws to give the SEC a role in appointing him.  To be sure, in announcing that policy change, the PCAOB pointed out that, unlike ALJs, the Chief Hearing Officer lacks authority to administer oaths, to issue, revoke, modify, or quash subpoenas, and to punish contemptuous conduct.  *Lucia* Press Release 2.  But those distinctions

---

[7] *Available at* https://pcaobus.org/news-events/news-releases/news-release-detail/pcaob-names-marc-b-dorfman-as-chief-hearing-officer_444 (last visited Jan. 7, 2025).

do not yield a different result.  Indeed, the Supreme Court rejected an identical argument in *Lucia*, noting that it had never held that *all* of *Freytag*'s factors must be present for "someone conducting adversarial hearings to count as an officer."  *Lucia*, 585 U.S. at 250.

50.    Here too, the minor discrepancies the PCAOB points to cannot overcome the force of the similarities between the Chief Hearing Officer and those found to be inferior officers in *Lucia* and *Freytag*.  Although the Chief Hearing Officer cannot *himself* administer oaths, he can obtain a court reporter to do so.  Rule 5200(c)(1).  Although he cannot issue, quash, or modify subpoenas, he can require the production of documents and testimony from registered entities and individuals by issuing ABDs.  *See* Rules 5200(c)(2) and 5424.  And although he cannot "punish contemptuous conduct," the Chief Hearing Officer has authority to "regulat[e] the course of a proceeding and the conduct of the parties and their counsel," Rule 5200(c)(4), as well as the power to issue a decision "with factual findings, legal conclusions, and sanctions[,]" *Lucia*, 585 U.S. at 250; Rule 5204(b).  As the Court recognized in *Lucia*, those authorities are indicative of "substantial informal power to ensure the parties stay in line" and underscore the "significant discretion" and authority the Chief Hearing Officer exercises in carrying out his "important functions." *Lucia*, 585 U.S. at 250.

### 2. The Chief Hearing Officer is unconstitutionally appointed

51.    The Appointments Clause provides that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. Const. art. II, § 2, cl. 2.  With respect to the Chief Hearing Officer, Congress made no such determination.

52.    Per the PCAOB's post-*Lucia* policy change, the Chief Hearing Officer was "appoint[ed]" by the Board, and that appointment was "approve[d]" by the SEC.  Dorfman Press

Release.  But neither body has the authority to lawfully effectuate that appointment.  Because the PCAOB is "subordinate to" the Commission and not a "freestanding component of the Executive Branch," it is not a "Department" for purposes of the Appointments Clause, and the Board is not its "Head."  *Free Enter. Fund*, 561 U.S. at 511 (footnote omitted); *see also id.* at 486 ("The Act places the Board under the SEC's oversight, particularly with respect to the issuance of rules or the imposition of sanctions (both of which are subject to Commission approval and alteration)." (citing 15 U.S.C. §§ 7217(b)-(c))).  As such, even though the Board might have *statutory* authority to make appointments (although that authority includes no reference to "officers"), *see* 15 U.S.C. § 7211(f)(4), it is not *constitutionally* empowered to appoint inferior officers.  U.S. Const. art. II, § 2, cl. 2.

53.     The opposite problem exists with the SEC.

54.     As the Supreme Court has recognized, the Commission qualifies as a "Head[] of Department[]" in whom Congress may vest authority to appoint inferior officers.  *Free Enter. Fund*, 561 U.S. at 511–12.  But Congress did not vest in SEC the authority to appoint the PCAOB's Chief Hearing Officer.  Under section 78d of the Securities Exchange Act of 1934, the Commission is authorized to "appoint and compensate officers, attorneys, economists, examiners, and other employees in accordance with section 4802 of title 5."  15 U.S.C. § 78d(b)(1).  Section 4802, in turn, provides that "[t]he Commission may appoint and fix the compensation of such officers, attorneys, economists, examiners, and other employees as may be necessary for carrying out its functions under the securities laws as defined under section 3 of the Securities Exchange Act of 1934."  5 U.S.C. § 4802(b).  Separately, the Commission is empowered to appoint members of the Board.  *See* 15 U.S.C. § 7211(4).

55.    Those provisions do not authorize the Commission to appoint the PCAOB's Chief Hearing Officer.

56.    Rather, section 78d empowers the Commission to hire *its own staff*, not the staff of the PCAOB.  Under the Sarbanes-Oxley Act, responsibility for hiring staff to carry out the PCAOB's functions is entrusted to the *Board*, not the Commission.  *See* 15 U.S.C. § 7211(f)(4).[8] Moreover, the Act states that "Board members and employees are not considered Government 'officer[s] or employee[s]' for statutory purposes."  *Free Enter. Fund*, 561 U.S. at 484 (alterations in original) (quoting 15 U.S.C. §§ 7211(a), (b)).  It is impossible to read the Commission's authority under section 78d as covering appointment of the Board's Chief Hearing Officer without creating an untenable conflict with that pronouncement.

57.    The conclusion that the SEC is not empowered to appoint the Chief Hearing Officer—clear enough from sections 78d and 7211—is made even plainer when 5 U.S.C. § 4802 is taken into account.  That provision, which is cross referenced in section 78d, not only authorizes the SEC to "appoint" officers, it directs the Commission to "fix the[ir] compensation."  5 U.S.C. § 4802(b).  In exercising that authority, the Commission is further directed to maintain "comparability" between the salaries of its employees and those of other specified federal agencies.  *Id.* § 4802(d); *see also id.* § 4802(e) (directing the Commission to "consult with the Office of Personnel Management in the implementation of this section").  But the salaries of PCAOB staff, including the Chief Hearing Officer, are *not* meant to be in parity with those of federal agency employees.  Rather, as the Supreme Court recognized, Congress made a deliberate

---

[8] That the powers of the Board are "subject to section 7217," which provides for Commission oversight, does not matter.  *See* 15 U.S.C. § 7211; *id.* § 7217.  Section 7217 articulates specific responsibilities for the Commission vis a vis the Board—namely, approving and amending Board-proposed rules, reviewing Board-imposed sanctions, and censuring the Board and its members.  *See id.* §§ 7217(b), (c), (d).  It does not speak to Board appointments.  *See id*.

choice in the Sarbanes-Oxley Act to exclude PCAOB staff from the strictures of federal employment to ensure that "[t]he Board [could] . . . recruit its . . . employees from the private sector by paying salaries far above the standard Government pay scale." *Free Enter. Fund*, 561 U.S. at 484–85.

### 3. The Chief Hearing Officer is unconstitutionally protected from removal

58.    Even if the Chief Hearing Officer had been constitutionally appointed, the Board's rules impermissibly afford him multiple layers of removal protection.

59.    In *Free Enterprise Fund*, the Supreme Court rejected tenure protections for PCAOB Board members, explaining that the combined effect of for-cause removal for Board members and the SEC responsible for appointing them served to divorce the Board from presidential oversight in violation of Article II. *See* 561 U.S. at 495. Because the PCAOB officers were "safely encased within a Matryoshka doll of tenure protections," they were "immune from Presidential oversight, even as they exercised power in the people's name." *Id.* at 497.

60.    That rationale applies equally to the PCAOB's Chief Hearing Officer, who *also* enjoys multiple levels of removal protection. For one thing, the Chief Hearing Officer is not removable "at will"—rather, the Board's rules prohibit removal for invidious reasons (like discrimination) and to influence the outcome of a proceeding. Like in *Free Enterprise Fund*, then, "[n]either the President, nor anyone directly responsible to him, nor even an officer whose conduct he may review only for good cause, has full control over the [Chief Hearing Officer]." *Id.* at 496.

61.    In addition to those substantive restrictions, procedural barriers block the Commission's ability to remove the Chief Hearing Officer.

62.    As amended, the Board's bylaws provide that "removal of any hearing officer shall be made by the Governing Board and shall be subject to the approval of the Securities and

17

Exchange Commission." Bylaw VI.3. In other words, the Commission *cannot* remove the Chief Hearing Officer on its own initiative and must instead await the action of the Board.

63.    Moreover, the Charter for the Office of Hearing Officers makes clear that "removal is subject to a vote of each multimember body." Charter at 2. Hence, even if the Commission were permitted to remove the Chief Hearing Officer absent a Board request, it could not do so if the Board voted to keep the person in office. Instead, the Commission would have to remove and replace enough Board members to ensure that the vote would come out in favor of removal.

64.    Just like in *Free Enterprise Fund*, those multilayered removal protections are impermissible.

**B.    The Board's Disciplinary Proceedings Violate the Seventh Amendment**

65.    "By its text, the Seventh Amendment guarantees that in '[s]uits at common law, . . . the right of trial by jury shall be preserved.'" *Jarkesy*, 603 U.S. at 122 (alterations in original). Whether a suit is one "at common law" depends on "the cause of action and the remedy." *Id.* at 123. Critically, the Supreme Court has long "reject[ed]" the notion that "*both* the cause of action *and* the remedy must be legal in nature before the Seventh Amendment right to a jury trial attaches." *Tull v. United States*, 481 U.S. 412, 421 n.6 (1987) (emphases added). Rather, an action must proceed before a jury if *either* the claim or the remedy so necessitates.

66.    Here, both the Board's cause of action against Plaintiff and its proposed remedies are legal, not equitable.

*1. The enforcement action is predicated on common law claims*

67.    "As Justice Story explained, the Framers used the term 'common law' in the [Seventh] Amendment 'in contradistinction to equity, and admiralty, and maritime jurisprudence.'" *Jarkesy*, 603 U.S. at 122 (quoting *Parsons v. Bedford, Breedlove & Robeson*, 28 U.S. 433, 446

(1830)).  "The Amendment therefore 'embrace[s] all suits which are not of equity or admiralty jurisdiction.'"  *Id.* (alteration in original) (quoting *Parsons*, 28 U.S. at 447).  That a claim may be based on a statute or rule "is immaterial"—so long as an action is legal in nature, it must be heard by a jury regardless of the "'peculiar form [it] may assume.'"  *Id.* (quoting *Parsons*, 28 U.S. at 447).

68.    The Board's allegations against Plaintiff, though nominally premised on violations of its rules, are common-law claims.

69.    As described above, the Board alleges that Plaintiff violated PCAOB Rule 3100, 3200, and 3400T.  Those rules are analogs for malpractice, which is defined by "a departure from accepted standards of practice" for professionals, including accountants.  *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 262 (S.D.N.Y. 2004) (footnote omitted).  Indeed, Rule 3100 by its terms requires "compl[iance] with all applicable auditing and related professional practice standards," and Rules 3200 and 3400T require nothing more than adherence to standards established by professional and regulatory bodies, including the 2003 iteration of GAAS, as issued by the AICPA.  Plaintiff is also alleged to have violated an audit standard derived from GAAS.

70.    Numerous courts have expressly held that violation of GAAS constitutes professional malpractice by accountants and auditors.  *See, e.g.*, *In re CBI Holding Co.*, 419 B.R. 553, 566 (S.D.N.Y. 2009) ("[T]he [SDNY] Bankruptcy Court's findings that E & Y's conduct of the Audits violated GAAS are sufficient to support its ruling on malpractice."); *Bd. of Trs. of IBEW Loc. 43 Elec. Contractors, Health & Welfare Annuity Pension Funds v. D'Arcangelo & Co.*, 1 N.Y.S. 3d 659, 661 (N.Y. App. Div. 2015) ("[P]laintiff sufficiently alleged that defendant committed malpractice in not adhering to GAAS . . . . ."); *In re Sharp Int'l Corp.*, 278 B.R. 28,

34–35 (E.D.N.Y. 2002) ("This Court finds that Sharp has adequately alleged that KPMG failed to adhere to GAAS in its audits of Sharp. . . .  Accordingly, to the extent that KPMG seeks dismissal of the complaint for failure to allege a departure from generally accepted standards of auditing practice, the motion is denied.").

71.    It is well established that malpractice claims were cognizable at common law.

72.    As commentators have noted, "the general concept of professional malpractice was well embedded in English legal theory by the beginning of the 18th century."  Maxwell J. Mehlman, *Professional Power and the Standard of Care in Medicine*, 44 ARIZ. ST. L.J. 1165, 1235 (2012) (quoting James C. Mohr, American Medical Malpractice Litigation in Historical Perspective, 283 JAMA 1731, 1732 (2000)) (internal bracket omitted); *see also* BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "Malpractice" as "[a]n instance of negligence or incompetence on the part of a professional" and identifying its origin in the seventeenth century). In accord with that historical tradition, the Supreme Court has recognized that breach of a duty best analogized to a claim for legal malpractice would be an action at law for Seventh Amendment purposes.  *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 568 (1990) (noting that an action for attorney malpractice was historically one at law (citing *Russell v. Palmer*, 2 Wils. K.B. 325, 95 Eng. Rep. 837 (1767)).

73.    Accounting and auditing malpractice are no different.  *See, e.g.*, *First State Bank v. Daniel & Assocs.*, 519 F. Supp. 2d 1157 (D. Kan. 2007) (noting that the common law recognized a cause of action for accounting malpractice); *Gallier v. Woodbury Fin. Serv. Inc.*, 171 F. Supp. 3d 552 (S.D. Tex. 2016) (same); *FDIC v. Cherry, Bekaert, & Holland*, 742 F. Supp. 612 (M.D. Fla. 1990) (recognizing that claims an accountant violated professional standards depends on common law).

## 2. *The remedies sought are legal in nature*

74.     According to its Order, the Board instituted the proceedings to determine whether sanctions are appropriate pursuant to Rule 5300(a), which allows for the imposition of "a civil money penalty for each . . . violation," as well as the revocation of registration, limitations on activities, and censure.  Those are "common law remed[ies]" that trigger the jury-trial right. *Jarkesy*, 603 U.S. at 123–25.

75.     In *Jarkesy*, the Supreme Court recognized that "monetary relief can be legal or equitable." *Id.* at 123.  Here, there is no question as to which side of the line the remedy falls. Rule 5303 authorizes the Board to impose "Money *Penalties*." *See* Rule 5303 (emphasis added). Such penalties—paid to the Board—are designed to "punish or deter the wrongdoer," rather than "solely to 'restore the status quo'" or to "compensate" any alleged victim.  *Jarkesy*, 603 U.S. at 123 (quoting *Tull*, 481 U.S. at 422)).

76.     Indeed, neither the Sarbanes-Oxley Act nor the PCAOB's rules authorize the Board to distribute penalties it collects to compensate victims of alleged violations.  *See* Rule 5303 ("All civil money penalties shall be used to fund a merit scholarship program for undergraduate and graduate students enrolled in accredited accounting degree programs, administered by the Board or by an entity or agent identified by the Board.").

77.     Other remedies the Board proposes against Plaintiff—revoking its registration or censuring the firm—are also designed to punish and deter.  That much is clear because neither sanction has any impact on those allegedly affected by Plaintiff's conduct, or any purpose apart from calling out its alleged misdeeds and discouraging other regulated individuals and entities from engaging in similar conduct.  Accordingly, the Board is seeking "prototypical common-law remed[ies]" available only in a court of law.  *Jarkesy*, 603 U.S. at 123.

### 3.  The public rights exception does not apply

78.    Although the Supreme Court recognized in *Jarkesy* that there is an exception to the Seventh Amendment's jury-trial requirement for cases concerning "public rights," that exception does not apply here.  *Id.* at 127.

79.    "Public rights are a narrow class defined and limited by history" to revenue collection, customs enforcement, immigration, relations with Indian tribes, administration of public lands, and the granting of public benefits.  *Id.* at 152–53 (Gorsuch, J., concurring).  The Board's claim that Plaintiff failed to comply with "professional practice standards," is far afield of those categories.  Rule 3100.

80.    Even if the class of public rights could be expanded, the exception still would not apply here because the rights at issue are private.

81.    "A hallmark that [the Supreme Court] ha[s] looked to in determining if a suit concerns private rights is whether it is made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789."  *Jarkesy*, 603 U.S. at 127–28 (internal quotation marks omitted).  As explained, professional malpractice is a species of negligence identified at common law.  "Congress may not withdraw . . . from judicial cognizance" adjudication of such "private rights."  *Id.* at 134 (internal quotation marks and citation omitted); *see also id.* at 132 ("[E]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts." (alteration in original) (citation omitted)).

### C.    The Board's Disciplinary Proceeding Violates the Due Process Clause

82.    It is axiomatic that the Constitution's promise of due process requires a fair proceeding in an impartial tribunal.  *See In re Murchison*, 349 U.S. 133, 136 (1955) ("[A] fair tribunal is a basic requirement of due process.").  "[A] fair . . .  hearing," the Supreme Court has

observed, is "the 'inexorable safeguard'" of liberty. *Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*, 301 U.S. 292, 304 (1937) (quoting *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 73 (1936)).

83.    As Justice Gorsuch recently explained, the Constitution built "high walls" around individual liberty and "clear distinctions" between enforcers and arbiters with good reason— because without them the government's power to infringe the rights of its citizens would be unbounded. *Jarkesy*, 603 U.S. at 167 (Gorsuch, J., concurring).

84.    To be sure, courts "do not presume that the mere combination of prosecutorial and adjudicatory functions leads to bias . . . ." *Wildberger v. Am. Fed'n of Gov't Emps.*, 86 F.3d 1188, 1195–96 (D.C. Cir. 1996) (citing *Withrow*, 421 U.S. at 54). But they must nonetheless "be alert to the possibilities of bias that may lurk in the way particular procedures actually work in practice." *Id.* (quoting *Withrow*, 421 U.S. at 54). The general rule "does not . . . preclude a court from determining from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high." *Withrow*, 421 U.S. at 58.

85.    In this case, such particular "facts and circumstances" exist.

86.    The Board's rules and practices for disciplinary proceedings set up an extraordinarily "tilted . . . game." *Axon*, 598 U.S. at 215 (Gorsuch, J., concurring). For one thing, *every party* involved on the Board's side—from the Enforcement Staff, to the Chief Hearing Officer, to the Board members themselves—is an employee of the Board and compensated by the Board. But that is just the tip of the iceberg. *Every piece* of the process is also stacked against the target of a Board disciplinary proceeding, leaving the individual or firm with little to no chance of convincing the Board not to find legal violation or issue sanctions.

87.    Before a respondent is haled into a disciplinary proceeding by the Board, the Board-employed Enforcement Staff engages in secret, *ex parte* communications with the Board members in an effort to convince them to approve an enforcement proceeding.  Even where respondents are afforded an opportunity to provide their own written submission to convince the Staff that a case is not meritorious, the Staff may rebut any and all of the respondent's submission in more *ex parte* communications with and presentations to the Board.   Rule 5109(d) ("In the event a recommendation for the commencement of a disciplinary proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Board in conjunction with the staff recommendation.").

88.    The situation does not improve once a disciplinary hearing is underway.

89.    During the hearing (as well as during any appeal to the Board itself), the Federal Rules of Evidence, and the prohibition against hearsay, simply do not apply.  *See* Rule 5441; *see also* PCAOB, Rules on Investigations and Adjudications at A2-113, n.11 (favorably citing SEC decision recognizing that hearsay is admissible in Commission proceedings)[9]; *cf. Jarkesy*, 603 U.S. at 144 (Gorsuch, J., concurring) (noting that, in SEC administrative proceedings, the Rules of Evidence, including the general rule against hearsay, do not apply "with the same rigor they do in court" (citation omitted)).

90.    In fact, Rule 5426 provides that the Chief Hearing Officer (or the Board on appeal) may in their discretion allow the introduction of the prior sworn statements of a nonparty witness in lieu of live testimony.   *Cf. Jarkesy*, 603 U.S. at 144 (Gorsuch, J., concurring) ("[In SEC

---

[9]  *Available at*  https://pcaobus.org/Enforcement/Documents/Release2003-015.pdf  (last visited Jan. 7, 2025).

administrative proceedings], live testimony often gives way to 'investigative testimony'—that is, a 'sworn statement' taken outside the presence of the defendant or his counsel." (citation omitted)).

91.     Making matters worse, respondents "enjoy[] no general right to discovery" in a Board proceeding.  *Id.* (Gorsuch, J., concurring).  Rather, the Rules provide for certain highly limited, pre-determined categories of documents to be available for inspection and copying by a respondent. *See generally* Rule 5422.  Depositions are rarely allowed once the investigatory phase has ended, and even where they are permitted, they are not for discovery purposes but rather to preserve the testimony of a witness who may be unable to appear at the hearing.  Rule 5425(a) Note.  Moreover, respondents cannot compel a deponent to appear.  They can only ask the Chief Hearing Officer to issue an ABD to a registered accounting firm or associated individual, or an accounting board request ("ABR") to a third party, and hope the recipient is willing to comply—a possibility that is hardly guaranteed with respect to third parties who are not subject to the Board's oversight.  Rule 5424(a).  Worse still, the Chief Hearing Officer has significant discretion to grant, deny, or modify a respondent's request for an ABD or ABR, leaving a respondent without recourse to obtain testimony relevant to the case if the Chief Hearing Officer so desires.  Rules 5424(a)(3); *cf. Jarkesy*, 603 U.S. at 144 (Gorsuch, J., concurring) ("Though [SEC] ALJs enjoy the power to issue subpoenas on the request of litigants . . . , they 'often decline to issue [them] or choose to significantly narrow their scope[.]'" (third alteration in original) (citation omitted)).

92.     That targets of disciplinary enforcement are forced to fight with one hand tied behind their backs is only half the story.  The other half is the exceedingly low burden the Enforcement Staff is required to meet to prove a violation.  *See* Rule 5204(a).  The Staff can prove its case with only a preponderance of the evidence, a standard the D.C. Circuit has called "rock bottom at the factfinding level of civil litigation."  *Charlton v. FTC*, 543 F.2d 903, 907 (D.C. Cir.

1976) (footnote omitted).  Making matters worse, whatever miniscule chance a respondent has to convince the Chief Hearing Officer or the Board not to find liability or issue sanctions is further undermined by the fact respondents are given no access to potentially favorable but unpublished Board legal precedent—a restriction that does not run to the Enforcement Staff.  *See* 15 U.S.C. § 7215(b)(5)(A).

93.    A target's right to appeal to the Board does not help.  The Board is, of course, the very body who received *ex parte* communications and presentations about the underlying disciplinary matter and who approved the charges in the first place.  Any appeal thus not only concerns the Enforcement Staff's decision and conduct but the Board's own prior determination that an investigation and disciplinary charges were warranted.  Common sense suggests that Board is unlikely to undercut its own judgment by later ruling for the regulated party.  In any event, per Rule 5460(c) and (e), the Board can summarily affirm the Chief Hearing Officer's initial decision "without further briefing, if it finds that no issue raised in the petition for review warrants further consideration by the Board."  Rule 5460(e).

94.    All told, enforcement targets like Plaintiff have virtually no chance for success through the Board's in-house disciplinary hearings.  Indeed, "[t]he numbers reveal just how tilted this game is." *Axon*, 598 U.S. at 215 (Gorsuch, J. concurring).  The public record on adjudications reveals no instance in which the Board overruled a decision in favor of the Enforcement Staff in its entire 22-year history, and to Plaintiff's knowledge such an occurrence would be extremely rare.  "[T]he risk of unfairness" in the proceeding, therefore, "is intolerably high[,]" and the general rule permitting the "combination of prosecutorial and adjudicatory functions" in one entity does not apply.  *Wildberger*, 86 F.3d at 1195–96 (citing *Withrow*, 421 U.S. at 54, 58).

**D.    The Board's Disciplinary Proceedings Violate The Private Non-Delegation Doctrine**

26

95.    "For a delegation of governmental authority to a private entity to be constitutional, the private entity must act only 'as an aid' to an accountable government agency that retains the ultimate authority to 'approve[ ], disapprove[ ], or modif[y]' the private entity's actions and decisions on delegated matters." *Alpine Sec. Corp.*, 121 F.4th at 1325 (alterations in original) (quoting *Sunshine Anthracite Coal Co.*, 310 U.S. at 388, 399).

96.    Here, a vast portion of the activities of the Enforcement Staff are conducted absent oversight by the SEC or even the Board.

97.    Indeed, the only role the SEC plays in the Board's enforcement actions is to review decisions of the Board in the event that a respondent does not settle, does not prevail before the Chief Hearing Officer, loses its appeal to the Board, *and* petitions for review by the Commission (or, hypothetically, the Commission undertakes to review a decision of the Board *sua sponte*). Engaging in protracted (and likely hopeless) litigation before the Board is a daunting prospect for many registered firms and associated individuals, making settlement the far more common resolution.

98.    In a typical enforcement action, therefore, the Commission plays no role at all.

99.    Even the involvement of the Board is sporadic.  As described above, Enforcement Staff may undertake "informal inquiries" absent any oversight by the Board.  *See* Rule 5100.

100.    Once the Board has rubber-stamped a formal investigation, the Enforcement Staff is empowered to issue ABDs, to examine books and records, and to take sworn testimony—all with minimal oversight by the Board.  *See* Rules 5102, 5103, 5104, and 5112.

101.    Accordingly, much of a registered entity's engagement with the Board in an enforcement action—a career-altering proceeding with wide-ranging implications—is with the

Board's private employees, none of whom exercises any constitutional authority even as an inferior officer.

102.    That is inconsistent with the constitutional mandate that private parties exercise authority "only 'as an aid' to an accountable government agency . . . ." *Alpine Sec. Corp.*, 121 F.4th at 1325 (quoting *Sunshine Anthracite Coal Co*, 310 U.S. at 388, 399).

**E.    The Board's Disciplinary Proceeding Is Premised On An Unconstitutional Delegation of Legislative Authority**

103.    The Constitution vests "[a]ll legislative Powers herein granted . . . in a Congress of the United States." U.S. Const. art. I, § 1. "Accompanying that assignment of power to Congress is a bar on its further delegation." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion).

104.    To be sure, "[t]he Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function . . . ." *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 421 (1935). But in order for a legislative delegation to be constitutional, Congress must "lay down by legislative act an intelligible principle to which the person or body authorized [to exercise the delegated authority] is directed to conform . . . ." *J.W. Hampton*, 276 U.S. at 409.

105.    In the Sarbanes-Oxley Act, Congress directed the Board to establish "fair procedures for the investigation and disciplining of registered public accounting firms and associated persons of such firms." 15 U.S.C. § 7215(a).

106.    That direction is too vague and nondescript to meet the "intelligible principle" requirement.

107.    Congress's amorphous direction has enabled the Board to run amok, establishing procedures that irretrievably tip the scales against the respondent in an enforcement proceeding, leading many to settle rather to expend resources in a battle that cannot be won.

## CAUSES OF ACTION

### COUNT I

**The Board's Disciplinary Proceeding Violates the Appointments Clause Because the Chief Hearing Officer Was Not Constitutionally Appointed**

108.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 107 as if fully set forth herein.

109.    The Chief Hearing Officer is an "Officer of the United States" subject to the Appointments Clause, and therefore must be appointed by the President, a court, or a "Head[] of Department[]," as determined by Congress.  U.S. Const. art. II, § 2, cl. 2.

110.    The Chief Hearing Officer was not so appointed.

111.    The SEC purported to ratify the Board's pre-existing appointment of the Chief Hearing Officer.

112.    The Board is not a "Head[] of Department[]" in whom appointment authority can be vested.

113.    Although the Commission is a Head[] of Department[]" in whom appointment authority can be vested, Congress did *not* empower the Commission to appoint the Chief Hearing Officer.

114.    Accordingly, the Chief Hearing Officer was not appointed consistent with the Constitution.  *See* U.S. Const. art. II, § 2, cl. 2.

### COUNT II

**The Board's Disciplinary Proceeding Violates Article II Because the Chief Hearing Officer Is Impermissibly Afforded Multiple Layers of Protection From Removal**

115.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 107 as if fully set forth herein.

116.    In *Free Enterprise Fund*, the Supreme Court explained that the combined effect of for-cause removal for Board members and the SEC responsible for appointing them served to divorce the Board from presidential oversight in violation of Article II.  *See* 561 U.S. at 495.

117.    The PCAOB's Chief Hearing Officer *also* enjoys multiple levels of removal protection.

118.    The Chief Hearing Officer is not removable "at will" because the Board's rules prohibit removal for invidious reasons (like discrimination) and to influence the outcome of a proceeding.

119.    In addition, procedural barriers block the Commission's ability to remove the Chief Hearing Officer.

120.    As amended, the Board's bylaws to provide that "removal of any hearing officer shall be made by the Governing Board and shall be subject to the approval of the Securities and Exchange Commission."  Bylaw VI.3.  Moreover, the Charter for the Office of Hearing Officers makes clear that "removal is subject to a vote of each multimember body."  Charter at 2.

121.    Just like in *Free Enterprise Fund*, those multilayered removal protections are impermissible.

## COUNT III

### The Board's Disciplinary Proceeding Violates the Seventh Amendment

122.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 107 as if fully set forth herein.

123.    In *Jarkesy*, 603 U.S. 109, the Supreme Court held that actions pursuing common-law claims and seeking legal remedies must be brought in court where the defendant is entitled to

30

a jury and cannot be adjudicated through administrative proceedings such as the disciplinary hearing at issue here.  *Id.* at 119–20.

124.    The Board's allegations against Plaintiff are akin to professional malpractice—a common law claim.

125.    The Board is authorized to impose monetary penalties—a legal remedy—as well as other penalties designed to "punish and deter the wrongdoer."  *Id.* at 123.

126.    The public rights exception does not apply because "Congress may not withdraw . . . from judicial cognizance" adjudication of "private rights" like malpractice claims.  *Id.* at 134 (internal quotation marks and citation omitted).

127.    Plaintiff's Seventh Amendment right to a jury trial attaches and the Board's claims cannot be adjudicated through an in-house agency proceeding.

## COUNT IV

**The Board's Disciplinary Proceeding Violates the Due Process Clause**

128.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 107 as if fully set forth herein.

129.    The Board combines the functions of "investigator, prosecutor, and judge under one roof" and "employ[s] relaxed rules of procedure and evidence—rules [it] [has made] for [itself]."  *Axon*, 598 U.S. at 215 (Gorsuch, J., concurring).  The result is an extraordinarily "tilted . . . game," *id.*, in which "the risk of unfairness is intolerably high."  *Withrow*, 421 U.S. at 53–58.

130.    Accordingly, the disciplinary hearing against Plaintiff does not comport with due process.

## COUNT V

**The Board's Disciplinary Proceeding Violates the Private Non-Delegation Doctrine**

131.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 107 as if fully set forth herein.

132.    A "private entity" exercising delegated government authority "must act only 'as an aid' to an accountable government agency that retains the ultimate authority to 'approve[ ], disapprove[ ], or modif[y]' the private entity's actions and decisions on delegated matters." *Alpine Sec. Corp.*, 121 F.4th at 1325 (alterations in original) (quoting *Sunshine Anthracite Coal Co.*, 310 U.S. at 388, 399).

133.    Large swaths of the authorities wielded by the Board in disciplinary proceedings are conducted by the Enforcement Staff absent oversight by the SEC or even the Board members.

134.    Accordingly, no accountable government agency retains the requisite authority over the Board's disciplinary proceedings.

## <u>COUNT VI</u>

**The Board's Disciplinary Proceeding Violates the Public Non-Delegation Doctrine**

135.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 107 as if fully set forth herein.

136.    In the Sarbanes-Oxley Act, Congress directed the Board to establish "fair procedures for the investigation and disciplining of registered public accounting firms and associated persons of such firms."  15 U.S.C. § 7215(a).

137.    That delegation of authority is too vague and amorphous to meet the constitutional requirement that Congress "lay down by legislative act an intelligible principle to which the person or body authorized [to exercise the delegated authority] is directed to conform . . . ."  *J.W. Hampton*, 276 U.S. at 409.

138.    Accordingly, the Board's disciplinary proceedings reflect an unconstitutional delegation of legislative authority.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

1. Enter a judgment declaring that the Board's disciplinary proceeding violates the Appointments Clause;

2. Enter a judgment declaring that the Board's disciplinary proceeding violates Article II;

3. Enter a judgment declaring that the Board's disciplinary proceeding violates the Seventh Amendment;

4. Enter a judgment declaring that the Board's disciplinary proceeding violates the Due Process Clause;

5. Enter a judgment declaring that the Board's disciplinary proceeding violates the private non-delegation doctrine;

6. Enter a judgment declaring that the Board's Disciplinary Proceeding violates the public non-delegation doctrine;

7. Issue a permanent injunction restraining Defendant from continuing with the disciplinary proceeding;

8. Award Plaintiff its costs and expenses, including reasonable attorneys' fees; and

9. Grant such other relief as the Court deems just and proper.

Dated: January 10, 2025              Respectfully submitted,

*/s/* Claudius B. Modesti
Claudius B. Modesti, D.C. Bar No. 441739
Martine Cicconi (*pro hac vice forthcoming*)
Kristen E. Loveland, D.C. Bar No. 1684978
John D. Richardson (*pro hac vice forthcoming*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
Robert S. Strauss Tower
2001 K St. NW
Washington, D.C. 20006

Tel: (202) 887-4000
Fax: (202) 887-4288
cmodesti@akingump.com
mcicconi@akingump.com
kloveland@akingump.com
jdrichardson@akingump.com

*Counsel for Plaintiff John Doe Corporation*